Good morning, your honors. May it please the court. Reese Anderson for Appellant Iron Bar Holdings. I hope to reserve three minutes for rebuttal. This case asks whether there's a federal right to enter private property to access adjacent public land for recreational purposes. That question has significant policy implications that affect both private property rights and public land access. But those policy implications should not cloud the settled legal principles that control this case. First, entering airspace immediately above the surface of the land of private property without permission or privilege is a black letter trespass under Wyoming law. Second, no federal law preempts a trespass law or creates the easement right to cross private property that the defendants claim here. The Supreme Court definitively resolved that question in 1979 in Leo Sheep. In the 45 years since, the government has not seen fit to use How did Leo Sheep definitively answer our question? To me, the cases are a jumbled mess. And post Leo Sheep, we have a case called Bergen, a 10th Circuit case, which discusses Leo Sheep and the Unlawful Enclosures Act and seemingly harmonizes them, acknowledges their independent applicability existence. Give me a little more nuance in how we can apply Leo Sheep here in those other cases. Happy to try to put the puzzle pieces together. Yeah, for sure. It's almost like a checkerboard. And when you're putting the pieces together, don't focus just on easement. Focus also on nuisance. I will, Your Honor. So I think the best way to understand Bergen is Bergen is Canfield. Canfield was the 1890 Supreme Court case about a large perimeter fence. Just like that, inside of that were public lands. Leo Sheep was different. Leo Sheep involved no fences. And the holding of the key language from Leo Sheep, the Supreme Court resolved that both as a matter of common law doctrine and as a matter of construing congressional intent, we are unwilling to imply rights of way with the substantial impact such implication would have on property rights granted 100 years ago. But Bergen does imply a right of way. I mean, when you boil it down, they're both variations on access, right? And I'm trying to see, you can say, well, the fence is a tangible item, but Bergen says it's not the intent, it's the effect of the enclosure. But Leo Sheep says no implied easement, yet Bergen's let the antelope have an implied easement, and the other cases let the donkeys have an implied easement, right? The sheep had an implied easement in other cases. Here, the humans are looking for an implied easement. This court was careful in Bergen to say that the UIA does not create any easements or servitudes. What it does is it abates public nuisances, to get to Your Honor's question. And that's important because that sustains the constitutionality of the Unlawful Enclosures Act. So if we look back at Canfield, the question in Canfield was, did Congress have the power under the property clause to regulate fences on private property? The Supreme Court said they did, because they were public nuisances. Here we have a legal cause of action, a trespass. No court, as far as I'm aware, has ever found that a legal cause of action constitutes a nuisance that can be abated under federal authority. So I think that's the big... Well, I think that's not a black letter of proposition you just said. I think the I don't know that it's been fully cabined by the law yet. But in any event, so that's where I'm concerned. And like Judge Timkovich, we do have Bergen and we have Burford. We've got plenty of cases that have language the other way. I mean, I've rarely seen such a jumbled mess of language and dicta and holdings. It is truly a mess. But kind of preeminent is our case, because Bergen came after some of these other critical cases. Was that a question? I'm sorry. I guess I would like for you to discuss what I think is, there is a common thread to me in several of these cases, and in particular in Buford, Leo Sheep, and McKay, and that is the concept of necessity. And I don't think that you could suggest that there's any other way that these hunters could have accessed the public land other than the most minimally intrusive way that they did. Helicopter crossing. Helicopter. But other than that, isn't necessity what's very important? And in particular, the Buford case that Judge Ebell just mentioned, in Leo Sheep, the court specifically distinguished Buford because that case involved necessity. There was no other way for the herder to get his sheep across the Utah checkerboard. Necessity plays an important role in Leo Sheep. And it's because the government cannot claim an easement by necessity because there is no necessity. They have the power in the domain of condemnation. They can create whatever access they want. Licensees of the government, which these hunters are- Don't go to licensee just yet. Let's continue on with necessity here. Let's talk about necessity in the capacity that we're currently talking about. Is there any other way, first of all, for them to know, Your Honor, there's not a less intrusive way, but the government can create that access by the stroke of an executive or legislative pen tomorrow. And that was critical to Leo Sheep. Leo Sheep sought to reconcile- They haven't created that access. I'm asking about today. Today, and for all the years past, the access to the public land that we are talking about is simply unavailable if they are not able to do this most minimal of crossings. Isn't that correct? That is correct, Your Honor. There simply is no access. So therefore, the necessity that the courts talked about in Leo Sheep and McKay, and particularly in Buford, why doesn't that take the day here? Leo Sheep is quite factually similar. It also involves Carbon County, Wyoming, and the request that the government was making to this court, which was adopted, was that without some right-of-way of access, the government could not access, in my extension, they were creating public access, right, to recreate a reservoir for hunting and fishing, the same circumstance we have here, that they needed a right- they had a right-of-way to cross the odd number of squares in order to access the public domain on the public's behalf. And this court adopted that, looking at Buford, looking at Canfield, looking at the UIA, and looking at McKay. Those were the authorities that the United States relied on for the purported right that it had. The Supreme Court unanimously reversed, looking at those exact same authorities, and reconciled them because the government, unlike some of the other cases, had that authority to create access. And that's what's really important here. Property lines have sharp edges because of the consequences of eroding them. So there's practical implications of this case that I want to address. I have two related questions, I think, that bear on that. Could the state of Wyoming essentially ratify, by statute, ratify corner crossing? Basically eliminate your civil trespass? It could, your honor. In fact, there was a bill introduced to do that that did not make it through the legislature. Could Wyoming law basically allow unfettered access through your client's property by eliminating the civil trespass? We see examples of those in the past. Now, it may constitute a taking entitled to just compensation. That's the Cedar Point Nursery Case from the Supreme Court in 2021, which I think is quite illuminating on this point about when you create access for the public on private property. But the Supreme Court, again, drew some sharp lines because of the potential for incremental erosion of property rights. Relatedly, could Congress ratify corner crossings through, I mean, one of the issues here is whether the UIA does that. But could Congress say, we're definitively going to, by regulation or statute, endorse what Judge Scavdall came up with here? Yes, your honor. In fact, they've got $900 million appropriated annually to do exactly that. The Federal Land Policy Management Act, one of its purposes is to secure access to public lands by purchase, exchange, donation, or eminent domain. Our client, in fact, has offered hand swaps to both the state of Wyoming as well as the Bureau of Land Management that would have consolidated parts of the checkerboard and increased public access to public land in this very part of Elk Mountain. But of course, that movement would not be aborted if this district court case was affirmed because the access here is fairly inconvenient and very, very restrictive. It wasn't involving a road or any kind of traditional public access. Not very many people carry six foot step ladders with them when they go out backpacking. So I don't see, however this case turns out, that it's going to have a significant abortive effect on the legislative effort to acquire access, maybe corner access, maybe other access. With one nuance, your honor, part of the federal government's authority allows them to create access where it is necessary. And so if it is not necessary to to use the tools at their disposal to create much more convenient thoroughfares or to engage in land swap. So there is a bit of a catch there that I think is important. Coming back to my question, that Congress could not do it unless they paid for it. Correct. It couldn't do it by regulation, in other words. It would be a regulatory taking. And in fact, regulations was what Cedar Point Nursery is about. It's a California statute that gave people a right to access private property. Why did you argue that the UIA is a taking? That's the best reason not to hold that the UIA reaches trespass. It would have been a monumental taking in 1885 that Congress never acknowledged, no one ever mentioned at the time. And so the best, the easiest way to resolve the UIA question is to find that the word enclosure does not include a trespass action. It means a physical obstruction. That's both consistent with the usage at the time when we talk about unenclosed lands. Why would a physical versus a forceful enclosure be valued differently or interpreted differently? That's a good question, Your Honor. So the reason they're valued differently is that Congress was evading the nuisance at the time. Those were giant perimeter fences. But they also in section three were interested, they were prohibiting uses of force and threats. The phrase they used was unlawful means. The natural implication of unlawful means is that Congress allowed lawful means that would prevent access. That is precisely the campfield carve out. And there's a really important passage. You're interpreting lawful and unlawful kind of to equate to force. And I'm not sure that reading the act, it does because the act has certain kinds of force that is specifically prohibited. And then it says and unlawful activity. It seems to me that the unlawful could be a broader interpretation. One of the, I think it's important to look at what the Supreme Court said in Campfield was lawful to do. And it said a private property owner doubtless has the right to fence in his own private property even if it means that the effect of that is to give on page 30 of our brief. That is a visual depiction of what a trespass action is. A trespass action only excludes people from entering private land. And so in Campfield, if the land owner brought a trespass action, you know, instead of building a fence, it would have been a different outcome. It's possible that it would have implicated the UIA. In fact, Leo Sheep says the UIA has no physical barrier. And so an enclosure is something under the statute that can be maintained, erected, constructed. It has to be removed or destroyed that's unlawful. All of these textual words refer to physical obstructions. The district court rules against you. You have five days to remove your enclosure. And so I think the easiest way to resolve this, again, is to find that a trespass action is not an enclosure. It is a lawful means. In fact, the means we want to encourage of I'll give you some rebuttal. And if we circle back to where we started, then Bergen is not binding authority because it didn't involve a trespass action? Bergen is Campfield. So Bergen is a perimeter fence applied to Antelope. And there's a passage that I'm sure we'll hear in just a moment, which is it's not the fence but the effect. And that's what Bergen says. Correct. In context, what the court was talking about is that you have to have an unlawful means, in this case, a fence, and an effect. The defendants had argued that because there were swinging gates on that fence, that meant it was no longer an enclosure. This court said, Antelope don't recognize gates. That doesn't minimize the effect of the fence at all. You have to have both things. And in that case, it was directly on point for Campfield. So the Supreme Court in Leo Sheep used the example from Campfield that said, because you can restrict access, the UIA cannot mean that it prohibits any measure that affects or obstructs access to public land. That's precisely the circumstance we have here. Again, all of this can be fixed by the government tomorrow. That was the fix that the Supreme Court recognized in Leo Sheep. If the government wants to create access, just as they have gone from 150 million acres of originally locked land, today, less than 9 million remain. They are making progress. Your time's up. I'll give you two minutes for rebuttal. Thank you very much, Your Honor. All right. Let's hear from the appellees. Mr. Simrad. May it please the Court, Ryan Simrad for the appellees. The Property Clause of the U.S. Constitution delegates to Congress plenary power over the public domain. With the Unlawful Enclosures Act, Congress chose to use that power to protect free passage over or through the public lands in the checkerboard by prohibiting obstruction of the saying. Through the UIA, Congress did not single out landowners to facilitate this passage, but it did tell everyone, including checkerboard landowners, that they can't make this passage impossible. There is no alternative way to freely pass between public land sections in the checkerboard other than corner crossing, while keeping off the neighboring private lands. Why is corner crossing the rule here? I mean, under your theory, the access could be at any on the landowner's parcel. Sure. In fact, in Bergen, the access was at the middle of the... It wasn't a corner crossing case. It was in the middle of the parcel. Right. But in Bergen, the fence at issue, the only part where it really touched the public land was at the corn. And so the question becomes, to answer the Bergen question, is, well, when it's not the fence but it's a fence, can we get rid of the fence, keep the effect, and we're okay? That would be quite the opposite of the whole thing. It would have said, it is the fence, not the effect that is the violation. And so I think that's kind of the problem here, is that if you can't do it with a fence, but you could do it by some other means. Now, I know they say, well, we're using a lawful means. Well, respectfully, a fence is not a meth lab. It's not, on its own, some contraband. A fence, it's how you use it that creates the violation. So I think in that way. Well, the problem for me is, it is Leo Sheep, because Leo Sheep says there's no implied access easements here, essentially. And what the court below has done is given the public an access easement across private property, basically preempted the trespass action here. I mean, you can read Leo Sheep that way. I think that some of these other cases cut in your favor. But the Supreme Court in Leo Sheep says no easement unless the government pays for it. Sure. And I think that Leo Sheep doesn't quite say that much. So I think in Leo Sheep, the actual statement is, we won't imply rights without a stronger case. And then there's footnote 24 that says, see, if this was Buford, it would be different. If there was no alternative, if they were engaging in lawful use that's historically recognized as time immemorial, maybe we would have reached a different outcome. And where does that rule come from? Well, I... Time immemorial, the rule of trespass is, you know, you get some of the space above your property. You know, I understand this necessity, but there's a technique called the easement by necessity, right? That could have been... Sure. Solved that problem. And this court in Bergen said just as much, that perhaps this is a better case for implying an easement because of these circumstances, there's no alternative means to Judge Moritz's point. And I think that this case is not Leo Sheep because we don't have the power of eminent domain. We don't come here as saying, well, we could have done it this way, but we chose to do it another way. There was... We meaning the defendants? We meaning my clients. Well, but the issue here is public access to the public lands. It's not a private right here. And, you know, the government on your... The federal government on your behalf can fix it tomorrow. That very, very optimistic view of our Congress, but sure. I guess that would be a way that it could be done. But I think that the better question is when Congress said in section 1063 of the UIA that no person... And I know that we've got hung up on unlawful means, which is the first clause, which has to do with peaceable entry. But I'm looking at the second clause because my clients were already on public land. And the second clause asks about free passage or transit over or and it just says no person shall prevent or obstruct. What they are saying is, well, if we don't use a physical thing, if we don't put a gun in your face, if we just sue you for a large amount of money, which I guess they dropped, then is that okay? And our answer is when Congress says you shall not obstruct free passage and when the Supreme Court in McKelvie says free passage means... But it does say over. I mean, the odd language there is over or through the public lands. And the obstruction rationale here is that we're obstructing only that infinitesimally small part that goes over and through private lands. And so that language isn't applicable. Well, Judge Ebell, in Bergen, again, the fence was right there, only at that section corner. That's exactly the only piece where the fence ever touched. And so under Mr. Anderson's rationale, Canfield distinguishes, well, if the fence is only on private land and it's only used to fence in my lands, then it's safe because doubtless we have this right. But in Bergen, the fence only touched at the common corner and yet this report and this report below, and the search area was denied, said that's within the statute. That's in that second section, shall prevent or obstruct. Absolutely. Which happens to be precedent in our court. Sure. The court below cleverly designed an access crossing over the corner. But as I understand the principle you're arguing, the courts could authorize a 50-foot access right through these corners. It seems to me we could have the defendants, the hunters, could have motorized vehicles access there. They might need handicap access for disabled hunters. What's the limiting principle that would tell me how much of a trespass is authorized at corners? So not to fight the hypothetical, but to fight the hypothetical just a little bit. Go ahead. Go for it. That we, this is why the framing matters. So we are not asking any court, never have we, ask for, give us the implied easement. Instead, we're saying tell them they can't stop us from peaceably accessing and passing through these lands because we are not intruding in those kind of more grandiose ways. We're not asking this court to pave a road as the government did in Leo Sheep. But why not? You could, couldn't you? Oh, I think that that would be a different case. Well, you know, it's a different case, but we have to write an opinion that applies to different facts. Correct. And I think that the way to do that is to follow Bergen's lead and to say that we, the UIA restrains landowners' use of their land in the same way that the preexisting land use limitations in the checkerboard say you can't exploit the interlocking land pattern to deny everybody else the benefits while you reap them all. Why isn't that a taking of private property, though? To put that limiting principle on checkerboard landowners? Yeah, to, basically, you're using the act to ratify a trespass. You know, that takes a stick out of the bundle of sticks of iron bar. You know, I would think that that would be, you know, that'd be a taking, a tangible right of some sort that would be compensated for. So I think that's actually the conversation in Canfield, because I think that was the argument. Is that, well, if the UIA is constitutional, then it is a taking of some sort, and just compensation must flow therefrom. But the Supreme Court unanimously in Canfield said, no, no, no, no. When Congress puts limits on landowners in the checkerboard and says you can't use your land in ways that eliminates entry, access, and use of the public land while you yourself enjoy a monopoly, that's not a taking. And historically, it is a taking. Well, I understand the dilemma here, but you're taking part of the landowner's use and enjoyment of his property. Well, and I guess if you want to go down to the black letter trespass conversation, is this a black letter trespass? It's not on its face. I think it's debatable. And so we think, no, it's not. But it is under Wyoming law. And no. So if this court looks at Joint Appendix, not Joint Appendix, but Appellate Appendix Volume 4, pages 786, 790, in opposition to summary judgment, we cited two cases from the Wyoming Supreme Court, Edgecombe and the Cheyenne Airport case. And those cases have to do with this concept of harmless airspace travel. And is that just on its own a trespass? And both of those cases said we need to have some substantial interference or damage with the underlying use of the land. And did they define what they meant by airspace? I mean, was it airplanes only, or would that include this latter concept? So in Cheyenne Airport, it was whether the landowner needed to cut down a tree for an airplane. And then in Edgecombe, it was a power line. So a little bit different pattern there. It didn't say, well, it's this many feet, that many feet. But it was the general proposition that this court also held in Pueblo, San Diego, that says a harmless, low-level airspace travel is not a trespass. And I know they say, well, that's air. Well, a power line may be even more applicable to you, because that's a more permanent intrusion. And I think that perhaps the power line might be a better case, but Edgecombe and Cheyenne Airport reached the same outcome or have the same holding. We need some effect on land. But do you read the amended Wyoming statute to ratify quarter crossing? We look at it as just one more endorsement of this concept that you need to have some kind of surface contact for it to be the violation. And that's the way that we read that. And I think, though, just to speak briefly on the Pueblo, San Diego issue, because I know in their brief they take issue, well, it's airplanes. It's not this kind of travel. I think that this court didn't say that, though, in its holding. It said, in general, it is not a trespass when there is no harm to the underlying surface use. But don't we rely on Wyoming law for that? And that's why this court should look to Edgecombe and Cheyenne Airport. Those are Wyoming Supreme Court decisions. So could every other state come out differently? Well, and that's- Wyoming changes law, and no matter what we rule, Wyoming could just take that rule and make it irrelevant again. Well, so that's one way that we would win is if Wyoming law was harmonized with the UIA. But we step back and take a different perspective as well, the broader perspective that says, well, Congress already spoke to this. Congress, with its limitless power over the public domain and the checkerboard, made a decision and codified a statute that no other person, including the landowners, can do this obstruction and prevention through any means. And I know they take issue with that in San Diego as well. And they say, well, the Supreme Court didn't mean what it said when it said by any means. But it did, because what they were saying, and if you look at that statute 1063, which has a variety of different means, force, threats, intimidation, fencing, which is apparently different than in closing, any other unlawful means, which is, again, about peaceful entry, and then the more kind of broad side of no person shall prevent or obstruct free passage or transit over, meaning over, and through, meaning through, we would think that that statute collectively is Congress's declaration that it would be odd indeed if Congress, in compliance with federalism and preemption, passed a law that says landowners can prevent access or prevent passage or transit through the public lands. That's the rule they're asking for, is that Wyoming law says they can do that. And we say that that can't be the case, because Congress spoke to this, and Congress has plenary power when we're dealing with a property clause exercise of legislation, as opposed to the spending clause cases they cite in their reply brief. So we think that, no, it would be great if Wyoming harmonized, but where it's discordant, like it is here, this court must apply the federal law, because the federal law necessarily overrides the conflicting state laws. Would the property clause give Congress the power to preempt state civil trespass laws? Yes. Let's say Wyoming banned corner crossing, under the property clause, Congress could abolish that without any compensation. Absolutely. With no compensation. Absolutely. In the checkerboard, in this way, yes. That answer then says that basically Congress has like a zoning power over private property in the states. That can't be right. Well, so I think it's also important to understand how the checkerboard was created. So in 1862, there wasn't a state of Wyoming. There was no state common law. It was a territory. And as Canfield said, in territories, Congress had absolutely full power, do whatever they want. And then 1864, they expand. And in 1885, still, we don't have a state. We only have the UIA, and we only have the railroad grants. Then 1890, we get finally the state of Wyoming, and it adopts black letter laws and things. But it has to adopt those laws against the backdrop of what had already taken place. That's how law functions. And I think it would be odd to say that Wyoming could have some common law that overrides all of these background principles from the grants themselves, which didn't give the landowners every section. It gave them the alternate sections, to the UIA, which says you shall not obstruct or prevent free passage. So I think that it's actually them and Wyoming that needs to do the labor of showing why they should be able to overcome all of these federal laws. So does that give Congress more power in the former territories then over private property regulation than in the original colonies? Well, I think it's a timing question, certainly. If the law was going to- Yeah, but your answer to me a minute ago was, yeah, Congress could come in and preempt state trespass law in Wyoming. I do stand by that. Could they do it in New Hampshire? I think they could. OK. You know, one thing that's not mentioned much, but if you look back at the original intent of the land grants, when the railroads were going across, Congress said, we want to give the railroads half the land and the public half the land. That was clearly their intent. And if we look at historical intent, if you would ask Congress, the half that you give to the public is illusory. You know that. Because the railroads could block out almost all of the access. Do you really intend to give an illusory right in the land grants? I have no doubts how Congress would have responded to that. But that argument doesn't seem to come up in the cases. But if you look back at what the original intent of the land grants, if somebody had just posed the question that way to Congress, I have no doubt how they would have answered that question. I think I have no doubt as well. I see him running out of time. Yeah, go ahead and wrap up with your final thought. Your Honors, I think that Mr. Anderson put it probably better than I could, which is this question comes down to, is this a Leo Sheep case or is this a Canfield-Bergen case? This is not a road case. We didn't build one. There's no permanent fixture. We're not asking this court to allow us to build one. Instead, it's an effects case. And we're asking this court to stop the unlawful effect of their obstruction. And for all those reasons, we'd ask this court to affirm the lower court's holding. Thank you. Thank you much. Allie, two minutes. Ayr's case is qualitatively different. As the Supreme Court recognized in Cosby, if you look at Restatement 159, there are different rules because a federal statute gives the public a right to be in an airplane in the navigable airspace. Isn't there a difference between an airplane, which is a transient airspace intrusion and an intrusion? Well, I guess this step ladder would be transient as well. But it seems to me an airline feels different. And it is different. The Restatement 159 treats them differently. So I think that's the best place to start. With respect to state law, the Bureau of Land Management, Department of Interior, and state officials have declared for decades that corner crossing is illegal. The idea that there is some hidden right under state law is not true. Judge Tinkovich, you nailed the no-limiting principle. If a corner crossing is not a trespass because there is a reasonable right of access to the public domain, the public will use ATVs, campers, snowmobiles. Suddenly, an airspace intrusion becomes a road in very short order. There is no limiting principle to the district court's rule. The camp field carved out- What if our opinion were cabined such that that wasn't permissible? I think if there was a way to do that, we would have heard it from the other side. If we were talking about simply the facts of this case, stepping over a- First, either you'd have to find that that was not a violation of Wyoming law, and we haven't heard a compelling argument why that would be the case. You'd need to find that federal law preempted the land use laws across the country. The UIA applies not just in the territories, but across the entire country. There is a very strong presumption against preemption. It is at its zenith when we're talking about traditional state powers, including, as this court said in Dean, including land use. This is not a land use regulation. To understand the difference between a physical taking and land use, the court should look to the Supreme Court's decision in Cedar Point, which made that difference. Which case? I couldn't understand what you said. Cedar Point, 2021. It's the difference between a Penn Central land use regulation and a physical taking. The last point I want to make, Judge Moritz, you asked about Buford and how to reconcile that. The Supreme Court footnote in Leo Sheave says Buford is motivated by two things, a century old grazing custom, a custom which can create rights and private property for easements and necessity. It had both of those elements. We certainly do not have a century old custom here. For decades, the relevant authorities have declared this practice to be illegal, and Leo Sheave said there's also no necessity today, because the government can create access by using its power within the domain and paying just compensation whenever it wants to take private land. But the hunters can't. The hunters can't do that. The hunters can petition their government just like anybody. They can petition, but that's not a right. So I don't give that really any weight, because it's not a right. We're talking about rights here. Exactly, Your Honor. And it's a strange formulation to say that someone has rights and someone else has private property. It's a very large doubt. If you want to say that someone's private land can be benefited from— But you have rights if your neighbor's property is producing toxic materials that flow onto your land or that even destroy the air above your land. So we're talking about airspace. You would have a right to stop that as a nuisance. Right, but there are public nuisance laws that would allow you to evade it, and that's precisely what the Supreme Court was doing in the Unlawful Enclosures Act. It was evading nuisances, and the Canfield carve-out says that if you fence your own land, which is what a trespass action is, that is okay. That does not violate the act, and that's important constitutionally because it's not a nuisance. Does it depend on the intent? Is there a subjective element here? I don't believe so, Your Honor. There's a circuit split on that. The 8th Circuit has said no. The 9th Circuit has said yes. This court didn't rule. I believe, again, the Canfield carve-out, which Leo, she talked about, eliminates that possibility because it says if you're doing it for a—if you're enclosing your own land, even if it has the effect, that's lawful. So I think that's a really important point that allows all of these cases to string together, and the counsel's argument just doesn't stand up against the Canfield carve-out. I urge this court to reverse. Thank you, counsel. Appreciate both the arguments. Well done. Good briefs also. You're excused, and the case is submitted.